**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 1 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

BOUNTAEM CHANTHADARA,

    Defendant-Appellant.

No. 97-3229

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 94-10128-01)

---

Vicki Mandell-King, Assistant Federal Public Defender, Denver, Colorado, and Gary Peterson, Oklahoma City, Oklahoma, (Michael G. Katz, Federal Public Defender, Denver, Colorado, with them on the brief), for Defendant-Appellant.

Robert J. Erickson, Department of Justice, Washington, D.C. (Jackie N. Williams, United States Attorney, Lanny D. Welch, Assistant United States Attorney, and D. Blair Watson, Assistant United States Attorney, District of Kansas, with him on the brief), for Plaintiff-Appellee.

---

Before **SEYMOUR** , Chief Judge, and **ANDERSON** and **HENRY** , Circuit Judges.

---

**HENRY** , Circuit Judge.

---

    Boutaem Chanthadara was convicted of robbery (pursuant to the Hobbs

Act, 18 U.S.C. § 1951(a)) and use of a firearm in a crime of violence under circumstances constituting first-degree murder (pursuant to 18 U.S.C. § 924(j)(1)). [1] For the first of these crimes, he has been sentenced to twenty years in prison. For the second crime, Mr. Chanthadara has been sentenced to death.

Mr. Chanthadara's case comes before us on direct appeal from his convictions and sentences. We exercise jurisdiction under 18 U.S.C. §§ 3595(a) and 3742(a) and 28 U.S.C. § 1291.

## I.  BACKGROUND

Mr. Chanthadara faces the death penalty for his involvement in a 1994 robbery of a restaurant in Wichita, Kansas. Viewed in the light most favorable to the government, the evidence at trial established the following series of events.

Mr. Chanthadara and four codefendants – Phouc Nguyen, Khammouk Namphengsone, Piyarath Kayarath, and Somlith Soukamneuth – gathered at Mr. Namphengsone's apartment during a party. The five decided to rob the Mandarin Chinese Restaurant in hopes of getting cash and gold jewelry.

The five men left the party in two cars, one stolen and one borrowed. They had two guns amongst them: Mr. Kayarath carried a 9mm pistol (the murder

---

[1]  The second superseding indictment charged a violation of 18 U.S.C. § 924(i)(1) (1994), which has since been redesignated as § 924(j)(1). This opinion uses the new designation.

weapon) and Mr. Nguyen carried a .32 caliber revolver. When the five arrived at the targeted restaurant, they noted that customers were still eating and decided to wait until only the owners were present.

To pass time, the men continued on to a nearby shopping mall. In the mall parking lot, Mr. Nguyen broke into several cars. When one of the car owners confronted him, Mr. Nguyen punched him several times, and Mr. Kayarath hit him on the head with the butt of the 9mm pistol.

Sufficient time having elapsed, the friends split up. Mr. Soukamneuth waited in a nearby parking lot in the borrowed car with which they planned to drive away from the robbery. The other four men drove the stolen car to the restaurant. Approaching the restaurant, Mr. Nguyen donned a black ski mask. The three others remained unmasked.

Mr. Mark Sun, the owner of the Mandarin Chinese Restaurant, testified that he first became aware of the robbery when he heard a loud crash in the front. As he went to investigate, a masked man, Mr. Nguyen, put a knife to his throat and forced him to the cash register. He opened the register and emptied its contents.

Mrs. Barbara Sun (a co-owner of the restaurant), a waiter, and the Sun's two children were also present in the restaurant. Mr. Namphengsone bound Mr. Sun and Mr. Wong with shoelaces behind the bar. The robbers ordered the children to lay down. Mr. Kayarath guarded the four at gunpoint. Mr. Nguyen

grabbed Mrs. Sun by her hair and neck and dragged her upstairs to a safe, which had been installed in the restaurant before the Suns bought it. Mr. Chanthadara accompanied them, and Mr. Kayarath soon followed. The safe was locked and empty, and the Suns did not know the combination. The robbers knew only that it was locked.

Mr. Namphengsone remained downstairs guarding the four prisoners. The only evidence about the sequence of events leading to Mrs. Sun's death came from Mr. Namphengsone, who testified that within minutes of having followed Mr. Nguyen upstairs, Mr. Chanthadara returned downstairs to check on Mr. Namphengsone. At that time, Mr. Chanthadara carried the 9mm pistol. Satisfied with the situation downstairs, he returned upstairs.

Some time later, the three men returned from upstairs. Now, Mr. Nguyen carried the .32 caliber pistol, Mr. Chanthadara carried the 9mm pistol, and Mr. Kayarath was unarmed. Mr. Namphengsone heard Mr. Nguyen announce, "He shot her." Rec. vol. 40, at 2113.

Leaving the restaurant, Mr. Chanthadara tried to retrieve something from a glass display case and tipped it over. His palm print was later matched to a palm print on the broken glass of the case.

The four men met Mr. Soukamneuth, still waiting in the borrowed car. Mr. Soukamneuth testified that Mr. Chanthadara held the 9mm pistol. He also

-4-

testified that, on the ride back to Mr. Namphengsone's apartment, Mr. Nguyen, Mr. Namphengsone, and Mr. Kayarath were all yelling at Mr. Chanthadara. According to Mr. Soukamneuth, Mr. Chanthadara responded by putting the 9mm to his own head and asking whether he should shoot himself. Mr. Soukamneuth further stated that he did not know at the time why the other men were angry with Mr. Chanthadara, but "later on" he determined it was because Mr. Chanthadara "shot the lady." Rec. vol. 40, at 2006-07. Finally, before reaching the apartment, Mr. Chanthadara threw the 9mm pistol into a river.

Mr. Namphengsone initially told FBI investigators that he heard nothing about anyone being hurt and that the 9mm pistol was taken back to his apartment, not thrown off the bridge. He subsequently changed this story to correspond with Mr. Soukamneuth's. FBI investigators would later search the area, but the gun was never recovered.

Mrs. Sun's body was discovered upstairs in the restaurant in front of the locked safe. She had been shot five times. Four of the gunshot wounds would have been fatal by themselves. Mrs. Sun had also been beaten. Nearby was a broken pool cue, which tested positive for traces of Mrs. Sun's blood.

The FBI investigation into the murder initially centered on Arisack Phongmany. From a photo spread, the victim of the parking lot assault (Mr. Bryan Kiser) had identified Mr. Phongmany as one of the participants.

The FBI soon determined that the same 9mm pistol had been used in a drive-by shooting a few weeks before the robbery. Mr. Phongmany pleaded guilty to the drive-by shooting and admitted to having used the 9mm pistol. Once arrested for the drive-by shooting, Mr. Phongmany invoked his _Miranda_ rights and refused to speak to agents investigating the restaurant robbery and killing.

The FBI interviewed Mr. Namphengsone after identifying his fingerprint on a table top at the restaurant. He expressed a willingness to cooperate. Based upon his story, the United States Attorney charged Mr. Namphengsone, Mr. Soukamneuth, Mr. Kayarath, Mr. Nguyen, and Mr. Chanthadara with robbery and homicide.

Two of the defendants, Mr. Namphengsone and Mr. Soukamneuth, pleaded guilty and testified for the government at trial. Mr. Namphengsone was sentenced to twenty-two years in prison, and Mr. Soukamneuth was sentenced to twenty years.

In contrast, Mr. Kayarath, Mr. Nguyen, and Mr. Chanthadara pleaded not guilty and proceeded to trial. The government sought the death penalty against the latter two men. After jury trials, Mr. Kayarath and Mr. Nguyen were convicted on both the robbery and murder counts and sentenced to life in prison. Mr. Chanthadara was also convicted on both counts. He was sentenced to twenty years in prison on the robbery charge and to death on the homicide.

## II. DISCUSSION

Mr. Chanthadara presents the following challenges to his convictions: (1) prejudice by exposure of jurors to a newspaper article reporting the trial judge's characterization of his defense; (2) a Jencks Act violation; (3) a violation of his rights under the Vienna Convention; (4) an unconstitutional jury selection plan; (5) district court errors in the jury instruction on malice and in the court's refusal to instruct the jury on second-degree murder as a lesser included offense; (6) an unconstitutional instruction on the Hobbs Act interstate commerce element; and (7) violations of 18 U.S.C. § 201(c)(2) as a result of the government's grant of lenity in exchange for the testimony of accomplices.

Additionally, he raises the following challenges to his death sentence: (1) district court errors in submitting certain aggravating factors to the jury; (2) prejudice by exposure of jurors to newspaper articles during the penalty phase; (3) erroneous exclusion of jurors for cause based on their death penalty views; and (4) district court error in admission of emotionally charged victim impact evidence during the penalty phase.

We first address the challenges to the guilt phase of Mr. Chanthadara's trial. Finding no prejudicial error, we affirm his convictions. As to Mr. Chanthadara's death sentence, we conclude there is a reasonable probability that

the jurors' exposure to the trial judge's comment referring to Mr. Chanthadara's defense as a "smoke screen" influenced the jury's determination. Additionally, under the standards set forth in Witherspoon v. Illinois, 391 U.S. 510 (1968), and Wainwright v. Witt, 469 U.S. 412 (1985), we conclude that the district court erred in excluding a venire member for cause based solely on her responses to a questionnaire. Accordingly, we vacate Mr. Chanthadara's death sentence on both grounds. We remand the case for re-sentencing consistent with this opinion.

## A. Challenges to the Conviction

### 1. Prejudice From Midtrial Publicity

Mr. Chanthadara's defense theory was that Mr. Phongmany committed the charged crimes. According to an FBI report, Mr. Kiser identified Mr. Phongmany as "the subject with the handgun that assaulted him." Rec. vol. 42 at 2502. Investigators determined that the 9mm firearm used to kill Mrs. Sun had been used in a drive-by shooting a few weeks prior to the robbery of the Mandarin Chinese Restaurant. Mr. Phongmany pleaded guilty to having fired the same 9mm firearm in the drive-by shooting incident. Agents investigating the robbery and homicide arrested Mr. Phongmany, but he invoked his Miranda rights and refused to answer questions.

Prior to Mr. Chanthadara's trial, the government filed a motion in limine to

exclude all evidence relating to Mr. Phongmany and his links to the murder weapon. When the defense was ready to present evidence on these issues, the district court judge ordered them to call the seven relevant witnesses, outside the jury's presence, to determine admissibility. After the hearing, the judge ruled that the evidence was admissible.

However, the judge commented that "I don't for a minute believe it, that this Arisack Phongmany committed the crime. I think it's a smoke screen. I mean, may as well just say what it is. It's a smoke screen, but I don't find . . . that I have any right to make the judgment on that issue." Rec. vol. 42, at 2477. He described the proffered evidence as "what I consider to be a totally bogus offer," and "just a way to mislead the jury." Id. at 2479. The jury was called back to the courtroom and allowed to hear the evidence. When court adjourned, the jurors were sent home, as they had not been sequestered.

The judge failed to consider the presence of journalists in the courtroom. The following morning, a local newspaper ( The Wichita Eagle ) ran an article on the judge's comments. The headline read: "JUDGE IN MURDER CASE CALLS DEFENSE STORY A 'SMOKE SCREEN.'" Add'm to Alpt's Br., doc. I. Before the jurors were called in that morning, defense counsel requested that the judge question them as to whether they had seen the article. The judge noted that the jurors would have violated his instructions if they had seen the article, but he

-9-

granted the request.

In speaking to the jurors, the judge confirmed the article was accurate. He said, "In the paper this morning there was an article regarding this case that reflected some comments that I made outside your presence." Rec. vol. 43, at 2718-19. Six of twelve jurors admitted to having seen the headline, but each of them denied having read any further.

The judge gave a curative instruction stating "anything that I say or do is not evidence and is not to be considered by you as reflecting my judgment on the case or what your verdict should be." Id. at 2719. He then individually questioned the six jurors who admitted to having seen the headline as to whether they understood the instruction and whether they thought their exposure to the headline would in any way affect their ability to render a decision based solely on the evidence admitted in court. Each of the six jurors confirmed that he or she understood the instructions and assured the court he or she would not be affected by exposure to the headline.

The defense moved for a mistrial, arguing the exposure destroyed any credibility the defense might otherwise have enjoyed. The judge denied the motion, and the trial continued through the presentation of a single remaining witness. The court then dismissed the jury for deliberation. On the same day, it returned a verdict of guilt. After the verdict was read, the judge again asked the

jurors, individually, whether "anything about what you saw in the headline influence[d] your deliberations or your verdict in any way." Rec. vol. 43 at 2785. Each reassured him that it had not.

Mr. Chanthadara now argues the district court's refusal to grant a mistrial violated his Fifth Amendment due process rights, his Sixth Amendment rights to counsel and a fair trial, and his rights under the Eighth Amendment. We review for an abuse of discretion a trial court's denial of a motion for a mistrial based on juror bias. See United States v. Thompson, 908 F.2d 648, 650 (10th Cir. 1990). "Under the abuse of discretion standard, a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court has made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Id. (quoting United States v. Ortiz, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986)).

Here, it is uncontested that six of twelve jurors were exposed to external information about the case in contravention of court instructions. "A rebuttable presumption of prejudice arises whenever a jury is exposed to external information in contravention of a district court's instructions." United States v. Davis, 60 F.3d 1479, 1484-85 (10th Cir. 1995) (citations and internal quotation marks omitted). This presumption is not conclusive. See id. However, it is the government's burden to establish that such contact was harmless. See id.

-11-

In assessing harmlessness, we first examine the external information to which the jurors were exposed. Next, we consider whether the prejudice caused by that information was outweighed by the judge's curative instructions, see United States v. Filani, 74 F.3d 378, 386 (2d Cir. 1996) (considering the effect of the court's curative instructions but concluding that they could not cure prejudice); United States v. Cisneros, 491 F.2d 1068, 1075-76 (5th Cir. 1974) (same), or by the jurors' assurances that they remained impartial, see United States v. Angiulo, 897 F.2d 1169, 1186 (1st Cir. 1990) (relying on jurors' statements of continued impartiality). Finally, we examine the record as a whole, asking whether the evidence of the defendant's guilt was overwhelming, such that the jurors' exposure to the external information was ultimately harmless.

In this case, the allegedly prejudicial information to which the jurors were exposed was the trial judge's assessment of Mr. Chanthadara's defense. The nature of that information – the presiding authority's evaluation of evidence that the jury was required to independently evaluate – raises serious concerns. The Supreme Court has recognized that "[t]he influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling." Quercia v. United States, 289 U.S. 466, 470 (1933) (internal quotation marks omitted); see also United States v. Williams, 809 F.2d 1072, 1086 (5th Cir. 1987) ("[A] trial judge has

-12-

enormous influence on the jury and therefore must act with a corresponding responsibility."); United States v. Brandom, 479 F.2d 830, 834 (8th Cir. 1973) ("The trial court commands the attention and respect of the jury. Great care must be exercised so as to avoid the appearance of advocacy for a particular party.") (internal quotation marks omitted); United States v. Marion, 477 F.2d 330, 332 (6th Cir. 1973) ("A jury composed of laymen will be greatly influenced by a judge's opinion of credibility."); United States v. Womack, 454 F.2d 1337, 1343 (5th Cir. 1972) ("It is well known, as a matter of judicial notice, that juries are highly sensitive to every utterance by the trial judge, the trial arbiter, and that some comments may be so highly prejudicial that even a strong admonition by the judge to the jury, that they are not bound by the judge's views, will not cure the error.").

In light of their potential influence upon the jury, the law places certain restrictions upon statements made by judges about evidence and arguments when jurors are present. Although federal judges may comment on the evidence, they "should not become an advocate and argue the case for either side." Filani, 74 F.3d at 385. If a judge does express an opinion about the facts, he or she must explain to the jurors that it is their responsibility to arrive at an independent determination of those facts and that they owe absolutely no deference to the judge's assessment. See id. "The point should never be reached where it appears

-13-

to the jury that the judge believes the accused is guilty." Id.

This circuit has applied these principles to conclude that a trial judge's statements deprived the defendant of a fair trial. In Davis v. United States, 227 F.2d 568 (10th Cir. 1955), the judge gave the jury the following instruction:

> I feel also it is my duty to state to you that a lot of people don't realize what a heinous crime it is to fool with drugs and defendant might not realize it when he did, but it is a crime. I think you should consider the fact within your knowledge of the ease or the difficulty of proving a transaction of the crime charged. I feel obligated to say to you that under this evidence, I am of the opinion, beyond a reasonable doubt, that the defendant did commit the act as charged, and I say that so that in the event you come to the same conclusion, you will know that I am of the same opinion, and at the time I say it, I don't take away from you at all your sole right as the judges of the facts, and if you don't agree with me it is your duty to follow your own conscience, and if you did, I am inclined to believe it would put a reasonable doubt in my mind, but I feel from my experience I have a duty in this kind of a case to so express an opinion and I have done it, and at the same time I caution you to use your own judgment and not put any greater weight on it than it should have. If you have a reasonable doubt as to the guilt of this defendant, it would be your duty to acquit him.

Id. at 569 (emphasis added). Noting that the judge's power to comment on the evidence "should be exercised cautiously and only in exceptional cases" and that the crucial facts were disputed, we held that the defendant was entitled to a new trial. Id. at 570.

We reached a similar conclusion in McBride v. United States, 314 F.2d 75, 76 (10th Cir. 1963). There, the judge concluded his instructions to the jury with an assessment of the evidence:

-14-

Now at this point I should like to say, as the third member or thirteenth member of the jury, that this is a rather simple case.

<u>The facts are clear in my mind that this little corporation was organized but for one purpose, and that is to use the mails and to defraud people, little people, out of money.</u>

. . . <u>I can't help but believe that [the accused's defense of good faith is not true ]</u> . . . .

Now I don't know. He says that he did it in good faith and that he was employed and that he worked as an employee, that he reported these things in order that somebody might, the company might make these loans. I can't help but believe that the accused here knew well when he started out that he was going to make a commission and whether or not he ever saw those poor people or not made little or no difference to him.

My views are that it's pretty serious business when we permit the people to use our mails and take advantage of our people.

Now what I have said to you is simply my views and you must disregard it. I have nothing to say except that I can make the remarks as I have; but you must disregard what I have said about this case.

You are the sole jurors of this case. You must pass upon this evidence yourself, so I am asking you to disregard what I have said to you with reference to my views. Disregard it completely. Do not consider anything I have said to you.

<u>Id.</u> (emphasis added). Interpreting these comments as "a statement of the court that the accused was guilty," we reversed the conviction and remanded for a new trial. <u>Id.</u> at 77.

Other circuits have taken a similar approach. <u>See, e.g.</u>, <u>Filani</u>, 74 F.3d at 385-87 (reversing conviction when the judge's extensive cross-examination of the

defendant and his repeated interference with defense counsel's cross-examinations gave the jury "a powerful impression that the district court agreed with the government that the defendant was guilty of the crime charged"); United States v. Diharce-Estrade, 526 F.2d 637, 642 (5th Cir. 1976) (reversing conviction after judge denied the defendant's motion for judgment of acquittal in the presence of the jury). But see United States v. Hester, 140 F.3d 753, 758 (8th Cir. 1998) (concluding that the trial judge's sua sponte ruling on the admissibility of coconspirator evidence before the jury, which included a statement that the evidence was sufficient to find by a preponderance of the evidence that the defendant was a member of the charged conspiracy, did not warrant a new trial); United States v. Martin, 740 F.2d 1352, 1357 (6th Cir. 1984), appeal after remand, 757 F.2d 770 (6th Cir. 1985) (concluding that judge's remark at bench conference that the defendant was guilty, overheard by one juror, did not constitute plain error).

In the instant case, the judge's statements resemble the statements of the judges in Davis and McBride in important respects. The characterization of Mr. Chanthadara's defense as a "smoke screen" directly concerns the dispositive issue before the jury, whether he committed the charged crimes. Significantly, the headline to which the jurors were exposed could be reasonably interpreted as not limited to a particular contention but to Mr. Chanthadara's defense generally. Cf.

-16-

United States v. Hardwell, 80 F.3d 1471, 1493 (10th Cir. 1996) (holding the trial court's comments on the evidence were not prejudicial because "although they may have attacked counsel's integrity, they did not indicate a belief in the defendants' guilt"); Williams, 809 F.2d at 1092-93 (considering a newspaper article's "effect on [the defendant's] legal defenses" and concluding the court erred in failing to voir dire the jury regarding possible exposure because the content of the article was such that it "place[d] the judge's official imprimatur on the credibility of [the government witness's] testimony" and, therefore, "raise[d] serious questions of possible prejudice"). The judge's reference to the "defense story [as a] 'a smoke screen'" could be reasonably viewed by the jurors as condemning a variety of arguments offered by Mr. Chanthadara. Cf. United States v. Jaynes, 75 F.3d 1493, 1503 (10th Cir. 1996) (noting that, although common law tradition allows the trial judge to comment on the evidence, "[t]he court's comments on the evidence should not mislead or be one-sided.").

With regard to the effect of the curative instructions, however, there is a difference between this case and Davis and McBride. In Davis, even though the judge reminded the jurors that they had an obligation to reach an independent determination as to the defendant's guilt, he also told them in the same sentence that it was his duty to state that he thought the defendant was guilty. See Davis, 227 F.2d at 569. Moreover, in stating his opinion, the judge referred to his

-17-

experience, thus suggesting that the jurors should give weight to his views. See id. Similarly, in McBride, the admonishment to the jury not to take the judge's views into account was substantially undercut by the boldness of those views, as well as the fact that he prefaced his remarks by identifying himself as the "thirteenth member of the jury." McBride, 314 F.2d at 76.

In contrast, in this case, the court went to some lengths to cure any prejudice resulting from the jurors' exposure. As noted above, the court gave thorough and immediate instructions informing the jury that its decision should be based solely on the evidence presented at trial. Unlike the judges in Davis and McBride, the judge here informed the jury that it should not interpret the article as an expression of his opinion about the case. At issue, then, is whether these curative measures effectively eradicated the prejudice presumed from the jurors' external exposure.

Generally, we assume that jurors follow the judge's instructions. See United States v. Powell, 469 U.S. 57, 66 (1984) ("Jurors . . . take an oath to follow the law as charged, and they are expected to follow it."). Nevertheless, in some instances, instructions are insufficient to cure the prejudice resulting from extraneous information received by jurors. See, e.g., United States v. Saenz, 134 F.3d 697, 713 (5th Cir. 1998) (stating that "[s]ome comments [by the trial judge] may be so prejudicial that even good instructions will not cure the error"); Filani,

-18-

74 F.3d at 386 (concluding that curative instructions to the jury stating that they could decide what version to believe as sole judges of credibility did not cure the prejudice resulting from the judge's extensive questioning of witnesses); Cisneros , 491 F.2d at 1075-76 (holding that the trial judge's negative comments on the credibility of a key witness "were simply too harmful to be cured by the other instructions given to the jury"); United States v. Hoker , 483 F.2d 359, 368 (5th Cir. 1973) (holding that "[n]o amount of boiler plate instructions to the jury — not to draw any inferences as to the judge's feelings about the facts from his asking questions, or that they are free to disregard factual comment by the judge, or as to the presumption of innocence — could be expected to erase from a jury's mind the part taken in this trial by the district judge," who extensively cross-examined the defendant).

In our view, the district court's curative instructions, although commendably detailed and promptly given, were insufficient to overcome the prejudice caused by its sweeping denunciation of Mr. Chanthadara's defense. When spoken by the official vested with the power of the United States government and controlling the trial, the vivid, memorable "smoke screen" characterization is the sort of comment that a reasonable juror, even though properly instructed and acting in good faith, would find extremely difficult to disregard.

The assurances of the individual jurors that the judge's statement would not affect their deliberations do not alter this conclusion. Compare United States v. Williams, 568 F.2d 464, 471 (5th Cir. 1978) (concluding that, when determining jury bias, individual assurances in response to the judge's voir dire regarding exposure to publicity may be considered but are not controlling), and Waldorf v. Shuta, 3 F.3d 705, 711 (3d Cir. 1993) ("Recognizing that the effect of exposure to extrajudicial, collateral information on a juror's deliberations may be substantial even though it is not perceived by the juror himself and recognizing that a juror's good faith may not be sufficient to counter this effect, courts have concluded that such assurances from jurors may not be adequate to eliminate the harm done by exposure to prejudicial information, including news reports."); with United States v. Angiulo, 897 F.2d 1169, 1186 (1st Cir. 1990) (relying on juror's statement of continued impartiality when articles to which jurors were exposed were not prejudicial), and United States v. Butler, 822 F.2d 1191, 1196 (D.C. Cir. 1987) (concluding that a juror's statement that an improper contact would have no bearing was reliable when the contact was "innocuous").

Nonetheless, the prejudice presumed, even if not cured by subsequent instructions and juror assurances of impartiality, may be proven harmless if the government can establish there was overwhelming evidence of the defendant's guilt. See Davis, 60 F.3d at 1485 ("[T]he most common means of demonstrating

-20-

the harmlessness of an extraneous contact is to show the existence of overwhelming evidence of the defendant's guilt.") (internal quotation marks omitted). [2] Accordingly, we must examine the record to determine whether the evidence presented by the government comports with this high standard.

In one count, Mr. Chanthadara was charged with violating 18 U.S.C. § 924(j)(1), which requires proof that he "caused the death of the victim while using a firearm to commit a crime of violence." In this regard, it is significant that he was also charged, pursuant to 18 U.S.C. § 2, with aiding and abetting the commission of a § 924(j)(1) violation. Thus, the jury was not required to find that Mr. Chanthadara himself killed Mrs. Sun. Instead, it could convict Mr. Chanthadara under an aiding and abetting theory if someone else committed the crime but he "1. [k]new that the crime charged was to be committed . . . 2. [k]nowingly did some act for purpose of aiding . . . the commission of the crime; and 3. [a]cted with the intention of causing the crime charged to be committed."

---

[2] In support of the contention that the evidence against Mr. Chanthadara was overwhelming, the government points to the decision in Mr. Nguyen's appeal before this court, noting the evidence "unequivocally showed" that Chanthadara "sho[t] Mrs. Sun during the course of a robbery." See Aple's Br. at 26 (quoting United States v. Nguyen, 155 F.3d 1219, 1225 (10th Cir. 1998)). It is not helpful that the evidence in Mr. Nguyen's case "unequivocally" implicated Mr. Chanthadara, for it was neither in the government's nor Mr. Nguyen's interest to dispute such evidence. Further, we cannot rely on the Nguyen court's assessment of the evidence to establish Mr. Chanthadara's guilt. To do so would at a minimum violate Mr. Chanthadara's Sixth Amendment right to confront the witnesses against him in a fair trial.

Add'm to Aplt. Br., doc. J, at Jury Instr. 23.

Moreover, one is guilty under 18 U.S.C. § 924(j)(1) if, during the course of a violation of § 924(c), he causes the death of a person through the use of a firearm and if that killing constituted a murder as defined in 18 U.S.C. § 1111. Mrs. Sun was killed during the course of a robbery. This killing constitutes a felony murder under § 1111(a).

"We have interpreted § 1111(a) and the felony murder doctrine to mean that a person who commits a dangerous felony, such as a robbery, 'is guilty of murder if a death occurs during the commission of [the] felony.'" Nguyen, 155 F.3d at 1225 (quoting Montoya v. United States Parole Comm'n, 908 F.2d 635, 638 (10th Cir.1990)). "[B]ecause § 924(j) incorporates § 1111 and its felony murder doctrine, a principal can violate § 924(j) even absent a specific intent to kill." United States v. Kayarath, 962 F. Supp. 1399, 1402 (D. Kan. 1997). Therefore, "[i]t follows that aiding and abetting does not require such an intent and that, like a principal, an aider and abettor can be liable for murder based upon his intent to commit robbery if a co-participant in the robbery causes the death of the victim through the use of a firearm." Id.; see also Nguyen, 155 F.3d at 1225 (concluding that, to convict a defendant of aiding and abetting a § 924(j)(1) violation, the government need only prove he "intended to commit the robbery and that a killing occurred in the course of that robbery" and that

-22-

"no additional proof of state of mind is necessary"). Thus, pursuant to the principles of aiding and abetting and the felony murder doctrine, we consider the strength of the evidence establishing Mr. Chanthadara willfully participated in a robbery during which a killing occurred.

Upon review of the record, we conclude that the government's evidence was overwhelming. Several witnesses recalled hearing Mr. Chanthadara discuss a robbery during the party at Mr. Namphengsone's duplex on the night the Mandarin Chinese Restaurant robbery took place. One of these witnesses specifically overheard Mr. Chanthadara arguing with Mr. Nguyen over who was going to hold the gun. Another witness claimed to see Mr. Chanthadara handling a gun at the party as well. Others testified they observed Mr. Chanthadara leave the party with Mr. Nguyen, Mr. Namphengsone, and Mr. Kayarath just prior to the robbery. The four men returned with a gun, a pile of money, and a cellular phone that had not previously been seen at the party. Mr. Sun testified that approximately $200 and a cellular phone were taken from the restaurant during the robbery.

In addition to witness testimony, investigators located a palm print in the restaurant following the robbery and identified it as Mr. Chanthadara's. Cf. Jones v. Hoffman , 86 F.3d 46, 47-48 (2d Cir. 1996) (concluding there was "ample evidence" to support the conclusion that the defendant aided and abetted the

-23-

robbery, and therefore could be found liable for felony murder, where defendant met his co-defendants at a party on the night of the robbery murder, all three were armed, he accompanied his co-defendants after being explicitly advised of their plans to rob someone and steal a car, and defendant's palm print was found at crime scene on the fender of a car near the victim's body). At the very least, the government established from all of this evidence that Mr. Chanthadara aided and abetted a robbery during which a killing occurred. See, e.g., Chaney v. Brown, 730 F.2d 1334, 1350 (10th Cir. 1984) (holding that an error arising from undisclosed evidence inferring defendant did not commit the murders was harmless because, in light of aiding and abetting theory and felony murder doctrine, the defendant's conviction for first-degree murder was supported by overwhelming circumstantial evidence establishing he participated at least as an aider and abettor in the kidnapping, in the course of which the victim's murder occurred).

Mr. Chanthadara was also charged with violating 18 U.S.C. § 1951(a), commonly known as the Hobbs Act. Section 1951(a) provides, in relevant part, that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery" shall be guilty of an offense against the United States. Mr. Chanthadara was additionally charged under 18 U.S.C. § 2 with aiding and abetting a Hobbs Act violation.

-24-

Because we have already concluded there existed overwhelming evidence that Mr. Chanthadara aided and abetted the robbery, we must proceed to consider whether there was overwhelming evidence that the robbery of the Mandarin Chinese Restaurant affected interstate commerce "in any way or degree." 18 U.S.C. § 1951(a). In Nguyen, we reiterated that a violation of the Hobbs Act requires proof of only a de minimis effect on interstate commerce.

> We have held that a depletion of assets potentially affecting interstate commerce constitutes a sufficient nexus to interstate commerce under the Hobbs Act. To establish this de minimis effect on interstate commerce the government must show that the crime depleted the assets of a business engaged in interstate commerce, thereby curtailing the victim's potential as a purchaser of goods.

Nguyen, 155 F.3d at 1228 (emphasis added); see also United States v. Zeigler, 19 F.3d 486, 495 (10th Cir. 1994) ("The Hobbs Act's jurisdictional predicate can be satisfied if a mere de minimis effect on interstate commerce is shown."). We further held that the jury could consider Mrs. Sun's death and the money stolen from her purse in assessing the effect on interstate commerce. See id. at 1227.

Mr. Chanthadara does not dispute that approximately seven percent of the Mandarin restaurant's total expenses was comprised of out-of-state food purchases and that the restaurant's revenues included those generated through the use of interstate credit cards. He also does not dispute that, following the robbery, the police ordered the restaurant to be closed for twenty-two days for investigation. Both Mr. Sun and the FBI's accounting expert testified that the

restaurant's revenues and interstate purchases dropped markedly after the robbery, causing the previously profitable business to close five months after it re-opened. Mr. Chanthadara concedes "the lengthy police closure order and the decision of some people to dine elsewhere may have had an eventual impact on the restaurant's level of out of state purchasing." Aplt's Br. at 78. Because the government only needed to prove the robbery had a de minimis effect on interstate commerce, we conclude there was overwhelming evidence establishing this element of the crime. See United States v. Balsam, 203 F.3d 72, 89 (1st Cir. 2000) (erroneous instruction on Hobbs Act count was harmless where defendant did not dispute overwhelming evidence establishing businesses at issue sold goods that moved in interstate commerce).

Thus, the evidence supporting both of Mr. Chanthadara's convictions was overwhelming. Accordingly, the jurors' exposure to the judge's smoke screen comment was harmless beyond a reasonable doubt as to Mr. Chanthadara's convictions. [3]

### 2. Jencks Act

John Massey, a fingerprint expert employed by the FBI, identified the palm

---

[3] In a subsequent section of this opinion, we will consider whether the jurors' exposure to the smoke screen article was harmless to Mr. Chanthadara at sentencing.

print found on the broken glass from the display case in the restaurant as Mr. Chanthadara's. After Mr. Massey testified, the defense moved pursuant to the Jencks Act for production of all transcripts in the government's possession of Mr. Massey's prior expert testimony. The Assistant United States Attorney stated that he had "no transcripts of [Mr. Massey's] testimony in any other trial in any other district during any of [Mr. Massey's] tenure as an expert." Rec. vol. 41, at 2348. The district court denied the motion.

Under the Jencks Act, "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). "Violations of the Jencks Act are subject to harmless error analysis." United States v. Woodlee, 136 F.3d 1399, 1412 (10th Cir. 1998). "The hope is that these statements will afford the defense a basis for effective cross-examination of government witnesses and the possible impeachment of their testimony without overly burdening the government with a duty to disclose all of its investigative material." United States v. Johnson, 200 F.3d 529, 534 (7th Cir. 2000).

Mr. Chanthadara cites no authority for his contention that prior trial testimony of an expert witness is Jencks material. Several circuits have held that

-27-

prior trial testimony is not within the scope of the Jencks Act because the witness statements contained therein are a matter of public record rather than being secreted within the government's files. See United States v. Albanese , 195 F.3d 389, 393 (8th Cir. 1999) ("[The government witness] gave his prior testimony at a public proceeding, so the government's failure to turn over a transcript of prior testimony violated neither [ Brady v. Maryland , 373 U.S. 83 (1963),] nor the Jencks Act"); United States v. Jones , 160 F.3d 473, 479 n.5 (8th Cir. 1998) (stating that matters of public record are "not within the scope of the Jencks Act"); United States v. Chen , 131 F.3d 375, 378 (4th Cir. 1997) (holding government's failure to provide defendants with transcript copy of witness's prior testimony in juvenile proceeding did not violate Jencks Act because government did not have custody of transcript of sealed juvenile proceedings); United States v. Isgro , 974 F.2d 1091, 1095 (9th Cir.1992) (holding that "trial testimony is not within the scope of the Jencks Act"); United States v. Hensel , 699 F.2d 18, 39-40 (1st Cir. 1983) (stating that "a transcript of a witness's testimony in a prior trial does not come within the language of the Jencks Act"); United States v. Lurz , 666 F.2d 69, 79 (4th Cir.1981) (concluding no Jencks violation by the government where the defendant was unable to obtain a transcript of a government witness's prior testimony because the transcript was in the possession of the court reporter, who is not an agent of the government); United States v. Harris , 542 F.2d 1283,

-28-

1293 (7th Cir.1976) ("[A] transcript of a witness's testimony in a prior trial is not within the Jencks Act."); <u>United States v. Munroe</u>, 421 F.2d 644, 645 (5th Cir. 1970) (same) . In accordance with the reasoning of our sister circuits, we similarly conclude transcripts of prior testimony are not Jencks material. As a result, the district court did not err in finding Mr. Chanthadara was not entitled under the Jencks Act to transcripts of all of Mr. Massey's prior testimony.

### 3. Vienna Convention

Mr. Chanthadara is a Laotian national. Laos and the United States are both parties to the Vienna Convention on Consular Relations, a treaty signed under the authority of the United States. Article 36 of the Vienna Convention provides:

> [I]f he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody, or detention shall also be forwarded by said authorities without delay. The aid authorities shall inform the person concerned without delay of his rights under this sub-paragraph.

Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, 101 T.I.A.S. No. 6820.

Mr. Chanthadara argued in a post-trial motion that the failure to notify him of his rights under this Article, and the failure to notify the Laotian consulate,

violated the Vienna Convention and therefore constituted reversible error. Because he did not raise this issue until after his trial, we review for plain error. See Fed. R. Crim. P. 52(b).

The government contends Mr. Chanthadara does not have standing to raise this issue. It asserts the Vienna Convention gives rights and duties to the party nations, but not the individuals affected. In support of its argument, the government cites Breard v. Greene, 118 S. Ct. 1352 (1998), for the proposition that "neither the text nor the history of the Vienna Convention clearly provides a foreign nation a private right of action in the United States' courts to set aside a criminal conviction and sentence for a violation of consular notification provisions." Id. at 1356 (emphasis added). In Breard, the Supreme Court refused to grant habeas relief when the Paraguayan government sought to stay the execution of a Paraguayan national. The government also suggests the absence of clear textual support in the Convention for an individual right establishes that no such right exists.

Contrary to the government's position, the Supreme Court in Breard "treated the issue of whether the provision creates any judicially enforceable rights as an open question, stating . . . that the Vienna Convention 'arguably' creates individual rights." United States v. Lombera-Camorlinga, 206 F.3d 882, 885 (9th Cir. 2000) (en banc) (citing Breard, 118 S. Ct. at 1355). In our view, it

is neither appropriate nor necessary to decide this unresolved issue under the facts presented here.   See id. at 886 ("[A]ssuming that some judicial remedies are available for the violation of Article 36, the exclusion in a criminal prosecution of evidence obtained as the result of post-arrest interrogation is not among them."); United States v. Li  , 206 F.3d 56, 60  (1st Cir. 2000) ("hold[ing] that irrespective of whether or not the [Vienna Convention] create[s] individual rights to consular notification, the appropriate remedies do not include suppression of evidence or dismissal of the indictment").

Even presuming the Vienna Convention creates individually enforceable rights, Mr. Chanthadara has not demonstrated that denial of such rights caused him prejudice.  Mr. Chanthadara lived in the United States since he was six years old.  He has not lived in Laos since he was three.  He speaks fluent English and has indicated no link to Laos other than technical citizenship.  As the district court noted, Mr. Chanthadara never requested officials to contact the Laotian consulate.  See United States v. Ademaj  , 170 F.3d 58, 67 (1st Cir.),   cert. denied , 120 S. Ct. 206 (1999) (rejecting Fifth Amendment due process claim, based on violation of Vienna Convention, on plain error review because appellant had not shown prejudice due to the alleged violation).  Therefore, he cannot establish plain error in the district court's denial of his post-trial motion for acquittal on this ground.

### 4.    The Kansas Jury-Selection System

Mr. Chanthadara asserts the jury-selection system in the District of Kansas systematically excludes blacks and Hispanics from the jury pool in violation of the Sixth Amendment and the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861-78.  This court has recently rejected a nearly identical challenge to the same jury-selection system.    See United States v. Shinault   , 147 F.3d 1266, 1270-73 (10th Cir.),  cert. denied , 525 U.S. 988 (1998).  We review the factual findings of the district court for clear error, and the court's legal determination of whether a prima facie violation was established de novo.      See id. at 1271.

The District of Kansas creates its Master Jury Wheel, from which potential jurors will be randomly selected, from actual voter lists.  Blacks account for 7.90 % of the over-seventeen population of the district.  Yet in the Master Jury Wheel blacks account for 4.67 %.  Thus, there is an absolute disparity between the over-seventeen black population and the black representation in the Jury Wheel of 3.23 %.  Hispanics account for 2.74 % of the over-seventeen population in the district, and for 1.14 % of the jury wheel.  The absolute disparity between the over-seventeen Hispanic population and Hispanic representation on the Jury Wheel is 1.60 %.

In order to establish a prima facie violation of the Sixth Amendment fair cross-section requirement, the defendant must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community;  (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community;  and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Duren v. Missouri, 439 U.S. 357, 364 (1979).  The government concedes, as it did in Shinault, that the first requirement is met – blacks and Hispanics each are distinctive groups in the community.  As to the second requirement, the government argues Mr. Chanthadara has not shown that blacks and Hispanics were sufficiently under-represented to establish a prima facie violation.

"In this circuit, absolute disparity . . . is the starting place for all other modes of comparison."  Shinault, 147 F.3d at 1273 (quotation omitted). "Absolute disparity measures the difference between the percentage of the group in the general population and its percentage in [the group qualified for jury service]."  Id. at 1272.  Yet absolute disparities are of a limited value when considering small populations.  See id. at 1273 (noting that "even the complete exclusion of the groups would result in absolute disparities of less than 6%").

Comparative disparities present similar problems.  They assess the "decreased likelihood that members of an underrepresented group will be called for jury service, in contrast to what their presence in the community suggests it should be."  Id. at 1272.  Comparative disparities are determined "by dividing the absolute disparity of the group by that group's percentage in the general

-33-

population." Id. "While these numbers may be more indicative of a Sixth Amendment violation, they too are distorted by the small population of the different minority groups." Id. The importance of the comparative disparity figure, therefore, is directly proportional to the size of the group relative to the larger community. We must consider both absolute and comparative disparities to determine whether a violation has occurred.

The Shinault court determined that comparative disparities of 59.84, 50.09, and 48.63 % failed to establish a prima facie violation where the groups in question comprised 1.27, 5.11, and 2.92 % of the population, respectively. In the present case, Mr. Chanthadara presents evidence that blacks, who account for 7.9 % of the district's population, have a comparative disparity of 40.89 %, while Hispanics, who make up 2.74 % of the district's population, have a comparative disparity of 58.39 %. These proportions of relative group size and comparative disparity here do not establish a prima facie violation. But see LaRoche v. Perrin, 718 F. 2d 500, 502-03 (1st Cir. 1983) (prima facie violation established where comparative disparity was 68.22 % and group comprised 38.4 % of population), overruled on other grounds by Barber v. Ponte, 772 F.2d 982 (1st Cir. 1985).

Finally, Mr. Chanthadara argues the further calculus of standard deviations, not presented in Shinault, should establish a prima facie violation. Standard deviations are not helpful in this case. Here, such calculations merely represent a

manipulation of the same numbers that we have held were not sufficient to establish a prima facie violation of the Sixth Amendment. Shinault is controlling. Therefore, the district court did not err in denying Mr. Chanthadara's motion to dismiss and quash the petit jury venire on this ground.

### 5. Jury Instructions

#### a. Second-Degree Murder Instruction

Mr. Chanthadara argues that the district court erred in refusing to give a lesser included offense instruction for second-degree murder. His argument requires us to determine whether, under federal law, second-degree murder is a lesser included offense of felony murder, the crime with which Mr. Chanthadara was charged. We engage in de novo review of that legal question. See United States v. Duran, 127 F.3d 911, 914 (10th Cir. 1997).

This circuit has established a four-part test to determine whether a lesser included offense instruction is warranted:

> [A] lesser included offense instruction is to be given when [1] there is a proper request for one; [2] the lesser included offense consists of some, but not all, the elements of the offense charged; [3] proof of the element or elements differentiating the lesser and greater offenses is a matter in dispute; and [4] a jury could rationally convict on the lesser offense and acquit on the greater offense.

United States v. Abeyta, 27 F.3d 470, 473 (10th Cir. 1994); see also United States v. Beck, 447 U.S. 625, 635 (1980) ("In the federal courts, it has long been

-35-

'beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.'" quoting  Keeble v. United States , 412 U.S. 205, 208 (1973)).  As to the second inquiry,  the Supreme Court has held that "one offense is not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense."  Schmuck v. United States , 489 U.S. 705, 716 (1989).  To be a "subset" of the greater offense, "the lesser [offense] must be such that it is impossible to commit the greater without first having committed the lesser.'"  Id. at 719 (quoting Giles v. United States , 144 F.2d 860, 861 (9th Cir. 1944) (internal quotation marks omitted).  Accordingly, when "the lesser offense requires an element not required for the greater offense, no instruction is to be given."  Id. at 716.

In this case, count 2 of the indictment charged Mr. Chanthadara with use of a firearm during a crime of violence under circumstances constituting first-degree murder as defined in 18 U.S.C. § 1111(a).  See Add'm to Aplt. Br., doc. A; 18 U.S.C. §§ 924(c)(1), 924(j)(1).  The government chose to proceed under a felony murder theory to first-degree murder under § 1111(a), which includes in the definition of first-degree murder "every murder . . . committed in the perpetration of . . . robbery."  Therefore, the jury was instructed that, in order to convict Mr. Chanthadara on Count 2, it had to find the following elements beyond a

reasonable doubt: (1) the defendant robbed the restaurant, as charged in count one; (2) the defendant knowingly used or carried a firearm during and in relation to the robbery; (3) during the robbery, the defendant directly caused the death of Mrs. Sun by use of the firearm; (4) the killing was murder, "that is, the unlawful killing of a human being with malice aforethought." See Aplt. Add'm at J, Guilt Phase Jury Instruction No. 17.

In contrast to first-degree felony murder, second-degree murder requires the government to prove: (1) the unlawful killing of a human being, and (2) malice aforethought. See United States v. Pearson, 203 F.3d 1243, 1271 (10th Cir. 2000). Mr. Chanthadara thus argues that second-degree murder is a lesser included offense of felony murder because it consists of some, but not all, of the same elements.

Under a literal reading of the federal statute, "malice aforethought" is an element of every type of murder. See 18 U.S.C. § 1111(a) (stating generally that "murder is the unlawful killing of a human being with malice aforethought"). However, the meaning of "malice aforethought" differs with respect to each kind of murder. Because the malice aforethought required for second-degree murder is different in kind, as opposed to degree, than the malice required for felony murder, we cannot conclude that second-degree murder is necessarily subsumed by felony murder.

-37-

As to first degree felony murder, "to prove the 'malice aforethought' element . . . , the prosecution only need show commission of the specified felony." United States v. Pearson, 159 F.3d 480, 485 (10th Cir. 1998); see also Pearson, 203 F.3d 1243, 1271 (10th Cir. 2000); Nguyen, 155 F.3d at 1225-26. Because malice aforethought is proved by commission of the felony, there is no actual intent requirement with respect to the homicide.

In contrast, the "malice aforethought" that must be established for second-degree murder requires proof of malice with respect to the homicide. "Second-degree murder's malice aforethought element is satisfied by: (1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent to do serious bodily injury; (3) a depraved-heart; or (4) commission of a felony when the crime does not fall under the first-degree murder paragraph of § 1111(a)." See Pearson, 203 F.3d at 1271. In light of this difference in the meaning of "malice aforethought" in felony murder and second-degree murder, "the lesser offense [second-degree murder] requires an element not required for the greater offense [felony murder]." See Schmuck, 489 U.S. at 716.

The only case of which we are aware that specifically addresses whether second-degree murder is a lesser included offense of felony murder under § 1111(a) is United States v. Chischilly, 30 F.3d 1144, 1159-60 (9th Cir. 1994). Applying the elements test adopted in Schmuck, the Ninth Circuit concluded:

-38-

> Unlike second-degree murder, conviction for felony murder under 18 U.S.C. § 1111 requires the commission of an enumerated felony with the requisite mens rea for the underlying offense. Obversely, second-degree murder requires proof that defendant acted with malice aforethought, whereas under a felony murder charge the commission of the underlying offense substitutes for malice aforethought. Therefore, the elements of second-degree murder are not a subset of the elements of first-degree felony murder, for "each offense requires proof of an element that the other does not."

Id. (quoting Whalen v. United States, 445 U.S. 684, 693 n.7 (1980)).

Although our decision in Franks v. Alford, 820 F.2d 345 (10th Cir. 1987) does not concern the federal murder statutes, its reasoning supports the Ninth Circuit's view in Chischilly. There, we held that, in downgrading a felony murder conviction under state law, the Oklahoma Court of Criminal Appeals had proceeded under the erroneous assumption that second-degree murder was a lesser included offense of first-degree felony murder. Noting that second-degree murder under Oklahoma law requires proof of depraved mind, we stated that "[second degree] murder is not a lesser included offense of felony murder because it requires proof of a mental state that felony murder does not." Id. at 347.

That principle applies with force here. Just as under Oklahoma law, second-degree murder under federal law requires proof of malice towards the homicide whereas felony murder does not. The fact that the Oklahoma felony murder statute states that the death may occur "regardless of malice" does not make the reasoning of Franks inapplicable. Regardless of the differences in

-39-

wording between the Oklahoma felony murder statute and felony murder under 18 U.S.C. § 1111(a), both statutes "permit[] a conviction for murder when a death occurs in connection with a defendant's commission of an underlying felony[,]" and "[t]he defendant's state of mind with respect to the death is irrelevant." Id. at 347.

For these reasons we hold that second-degree murder is not a lesser included offense of felony murder under § 1111(a). See Chischilly, 30 F.3d at 1159-60; cf. Franks, 820 F.2d at 347. Accordingly, Mr. Chanthadara was not entitled to an instruction on second-degree murder.

**b. Malice Instruction**

Mr. Chanthadara also challenges the court's instruction on malice, arguing that it set a lesser standard than required by the applicable law. In defining "malice aforethought," the court instructed the jury it would be present if there was intent to kill or if the killing "results from the commission of a robbery." See Add'm to Aplt. Br., doc. J, Guilt Phase Jury Instruction No. 19. The district court's instruction comports with well-established Tenth Circuit law as well as the common law of felony murder. See Pearson, 159 F.3d at 485 ("'[M]alice aforethought' is a term of art which has several definitions, including, in the felony murder context, proof of commission of the specified felony.") (citing

Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law §§ 7.1(a), 7.5(e)-(h) (2d ed. 1986)). Therefore, the jury instruction defining malice aforethought was not erroneous. [4]

### c. Hobbs Act Instructions

Mr. Chanthadara further challenges his conviction on grounds that the jury instructions on the interstate element required for a Hobbs Act violation were erroneous. We review the legal correctness of these instructions de novo and refusal to deliver a particular instruction for abuse of discretion. See United States v. Voss, 82 F.3d 1521 (10th Cir. 1996).

Mr. Chanthadara first challenges the instruction stating that the element is satisfied when interstate commerce is "actually or potentially delayed, obstructed,

---

[4] The district court's instruction defining the elements of first-degree murder is not erroneous, but it is redundant when combined with the instruction defining malice aforethought. According to instruction 17, the four requirements for the government to sustain its burden on count two were: (1) commission of the robbery; (2) knowing use of a firearm during the robbery; (3) causing the death of Mrs. Sun during the robbery; and (4) doing so unlawfully with malice aforethought. Then, instruction 19 describes a killing done with malice aforethought as one resulting "from the commission of a robbery." Add'm to Aplt's Br., doc. J. Combining these instructions, the fourth requirement for conviction on the murder charge, "malice aforethought," is no more than the combination of the first and third requirements – a robbery and that the killing happened in commission of the robbery. The redundancy did not prejudice Mr. Chanthadara. It does, however, clarify why Mr. Chanthadara might have erroneously believed he was entitled to a lesser included offense instruction on second-degree murder.

-41-

or affected in any way or degree." Add'm to Aplt's Br., doc. J, Guilt Phase Jury Instruction No. 11. He maintains that this instruction improperly allows a conviction for a Hobbs Act violation for acts beyond Congress' Commerce Clause power to regulate.

We have expressly rejected this argument. See United States v. Bolton, 68 F.3d 396, 399 (10th Cir. 1995); Nguyen, 155 F.3d at 1226-27. Absent an intervening change in the law, which is not present in this case, or en banc review, we cannot review the judgment of another panel of this court. See In re Smith, 10 F.3d 723, 724 (10th Cir. 1993).

Mr. Chanthadara further argues the reference to a "potential" effect on interstate commerce in the instruction would be permissible only if the government had pursued a conviction under an attempt theory, which it did not. This argument is also precluded by Nguyen. See Nguyen 155 F.3d at 1228 n.3 ("Defendant's argument that the use of the potential or probable language is limited to extortion or attempt cases is invalid.").

Mr. Chanthadara also challenges the court's instructions allowing the jury to consider the items of value taken from Mrs. Sun's purse. He argues that these personal items were not shown to be in the stream of interstate commerce. In Nguyen, this court rejected the same argument regarding the same instructions. See id. at 1227 (holding that the jury "could appropriately consider the money

stolen from Mrs. Sun's purse for its impact on commerce" because it was "stolen during the course of the robbery of the restaurant" and was taken "from the purse that belonged to an owner and operator of a business engaged in interstate commerce"). Mr. Chanthadara seeks to distinguish Nguyen on the ground that, in that case, it was never established that the restaurant was owned by a corporation and not by Mr. and Mrs. Sun. The distinction is specious, as it merely talismanically invokes the corporate label while ignoring the fact that the corporation is comprised solely of Mr. and Mrs. Sun.

Finally, Mr. Chanthadara argues the proven impact on interstate commerce was so minimal that, absent a clearer instruction to the jury as to what constitutes sufficient impact, the district court prejudicially reduced the burden on the government to establish the interstate element for a Hobbs Act violation. Again, this argument is precluded by our prior decisions in Bolton, 68 F.3d at 399, and Nguyen, 155 F.3d at 1227-29. Accordingly, there was no error in the jury instructions defining the elements of a Hobbs Act violation.

### 6. **Singleton**

Finally, citing United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998), Mr. Chanthadara claims his conviction should be reversed because the prosecution violated 18 U.S.C. § 201(c)(2). On en banc review, this court has

since reversed Singleton, and we are bound by the en banc ruling that § 201 does not prohibit a prosecutor, acting as an agent of the government, from making "a concession normally granted by the government in exchange for testimony." See United States v. Singleton, 165 F.3d 1297, 1302 (10th Cir.) (en banc), cert. denied, 119 S. Ct. 2371 (1999).

## B.     Challenges to the Death Sentence

### 1.     Aggravating Factors

Mr. Chanthadara challenges three of the aggravating factors presented to the jury for consideration in its decision between a sentence of life imprisonment and death. Specifically, he challenges the non-statutory intent factor, as well as the two statutory factors: the commission of the offense in a heinous, cruel, or depraved manner and commission of the offense in consideration for, or expectation of, pecuniary gain.

### a.     Non-statutory Intent Factor

As a non-statutory aggravating factor, the district court instructed the jury to consider the intent with which Mr. Chanthadara entered into the act of violence. Mr. Chanthadara objects to this instruction on the ground that it merely duplicated one of the gateway factors required before a defendant is even eligible

-44-

for the death penalty and, as such, failed to narrow the field of defendants.

Our court has specifically rejected this argument.    See United States v. McCullah , 76 F.3d 1087, 1109 (10th Cir. 1996) ("While [the aggravating factors] . . . may mirror the intent element found at the guilt phase, this is permissible."); cf. Lowenfield v. Phelps , 484 U.S. 231, 246 (1988) (holding "the fact that the aggravating circumstance duplicated one of the elements of the crime does not make [a death] sentence constitutionally infirm").  The Constitution requires that a capital sentencing scheme "genuinely narrow the class of persons eligible for the death penalty and [] reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."    Zant v. Stephens , 462 U.S. 862, 877 (1983).  Here, the element of specific intent adequately performs this constitutionally required narrowing.  Therefore, the duplication of a factor between the gateway factors and aggravating factors does not undermine the constitutional validity of the sentence.    See McCullah , 76 F.3d at 1109.

### b.    Especially Heinous, Cruel, or Depraved Conduct

The district court instructed the jury to determine whether "the defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim."  18 U.S.C. §

-45-

3592(c)(6); Add'm to Aplt's Br., doc. N, Penalty Phase Instr. No. 12. Mr. Chanthadara contends the court's instruction was erroneous for the following reasons.

First, he suggests the instruction improperly permitted the jury to consider abuse inflicted on the victim after she lost consciousness or died. The heinous, cruel, or depraved instruction reads, in part:

> To establish that the defendant killed Barbara Sun in an especially heinous, cruel, or depraved manner, the United States must prove that defendant's actions involved either torture or serious physical abuse to Barbara Sun.
>
> . . .
>
> Serious physical abuse — unlike torture — may be inflicted either before or after death and does not require that Barbara Sun be conscious of the abuse at the time it was inflicted.

Add'm to Aplt's Br., doc. N, Penalty Phase Jury Instruction No. 12. Mr. Chanthadara does not suggest a constitutional problem with allowing the jury to consider abuse to the victim after death as an aggravating factor, rather, he argues the district court misinterpreted § 3592(c)(6).

Only the Fifth Circuit seems to have addressed the issue of whether § 3592(c)(6) applies to abuse occurring after loss of consciousness or death. In United States v. Hall, 152 F.3d 381, 415 (5th Cir. 1998), abrogated on other grounds in United States v. Martinez-Salazar, 120 S. Ct. 744 (2000), the Fifth Circuit upheld § 3592(c)(6) instructions nearly identical to the one given in this

-46-

case. The Hall court concluded that the jury could consider conduct that occurred after the victim lost consciousness because it indicated that "the killing was committed in a depraved manner in that it provide[d] an indication that Hall relished in the killing." Hall, 152 F. 3d at 415 (citation omitted); cf. Richmond v. Lewis, 506 U.S. 40, 51 (1992) (indicating that "gratuitous violence" factor of a state's "heinous and depraved" aggravating circumstance could constitutionally be applied to defendant who ran over victim twice with car, regardless of whether he knew the victim died after the first pass). Mr. Chanthadara directs us to no authority suggesting an alternate construction of § 3592(c)(6), and therefore we see no error in the district court's instruction here.

Second, Mr. Chanthadara contends the instruction was erroneous because it failed to instruct the jury that mental harm sufficient to establish torture must be "prolonged." Again, this argument is not a constitutional challenge but rather one asserting the proper construction of § 3592(c)(6). Mr. Chanthadara argues the "prolonged" language was necessary because 18 U.S.C. § 2340(2) requires mental harm to be "prolonged" in order to constitute "torture."

Mr. Chanthadara's reliance on the definition of torture in § 2340(2) is misplaced. The definition of "torture" in § 2340 is limited to the use of that word in Chapter 113C, of which § 3592(c)(6) is not a part. Moreover, the definition begins with the following language— "'torture' means an act committed by a

-47-

person acting under the color of law    . . . ."—which further demonstrates its misapplication in this context.  18 U.S.C. § 2340(1).  Consequently, we find this argument to be without merit.

Mr. Chanthadara next suggests the instruction was erroneous because it failed to require that the abuse "significantly exceed" that necessary to cause death.  This seems to be an assertion that the factor without such limitation is unconstitutionally vague—a standard that "fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in Furman v. Georgia  [, 408 U.S. 238 (1972));   United States v. Jones   , 132 F.3d 232, 249, aff'd 527 U.S. 373 (1999) (citing    Maynard v. Cartwright   , 486 U.S. 356, 361-62 (1988)).

"As long as an aggravating factor has a core meaning that criminal juries should be capable of understanding, it will pass constitutional muster."        Jones v. United States , 527 U.S. 373, 400 (1999).  Moreover, "[a]ny vagueness in the language [of a heinous, cruel, and depraved aggravating factor] . . .  is cured by the limitation in the statute that the offense involve torture or serious physical abuse." Jones , 132 F.3d at 249 (citing    Walton v. Arizona  , 497 U.S. 639, 654-55 (1990));  see also  United States v. Webster   , 162 F.3d 308, 354 (5th Cir.) (applying Hall to conclude that the "especially heinous, cruel, or depraved" aggravating

factor is not impermissibly vague), cert. denied , 120 S. Ct. 83 (1999). The instruction in question here informed the jury that it was required to find that the defendant engaged in torture or serious physical abuse. Therefore, it was not unconstitutionally vague.

Finally, Mr. Chanthadara contends that by allowing the jury to consider the senselessness of the killing and the helplessness of the victim, the instruction lost any narrowing function it otherwise had and, therefore, violated the Eighth Amendment. Again, this argument is unpersuasive in light of the Fifth Circuit holdings. The instruction upheld in Hall (which was virtually identical to that upheld by the Fifth Circuit in Jones ) stated that "[p]ertinent factors in determining whether a killing was especially heinous, cruel, or depraved include . . . senselessness of the killing; and helplessness of the victim." Hall , 152 F.3d at 414. Accordingly, we conclude the instruction on the heinous, cruel, or depraved statutory aggravating factor was not erroneous.

### c. Pecuniary Gain

The district court also instructed the jury to determine whether "the defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary gain." 18 U.S.C. § 3592(c)(8). The district court gave an instruction on this aggravating factor as

-49-

follows:

> To establish that defendant committed the offense in the expectation of the receipt of anything of pecuniary value, the United States must prove defendant committed the offense in the belief or expectation that he would receive something of value. The words "expectation of receipt" should be given their ordinary, everyday meaning which includes obtaining or expecting to obtain something. "Anything of pecuniary value" means anything in the form of money, property, or anything else having some economic value, benefit or advantage.

Add'm to Aplt's Br., doc. N, Penalty Phase Jury Instr. No. 13.

Mr. Chanthadara objects to this instruction as failing to properly limit the scope of the offense. With regard to felony murder, he argues application of this aggravating factor is reserved to scenarios where the expectation of pecuniary gain is from the actual killing and not the underlying felony. Here, he asserts, the jury could not have found the aggravating factor because the evidence showed all available property in the restaurant had already been seized before the homicide occurred. Moreover, the government provided no evidence, aside from the robbery itself, that Mr. Chanthadara or his accomplices expected further monetary benefit as a result of the homicide. We review challenges to jury instructions de novo and inquire whether, considering the instructions as a whole, the jury was misled. See Voss, 82 F.3d at 1529.

With regard to the proper construction of 18 U.S.C. § 3592(c)(8), we agree with Mr. Chanthadara that the statute requires that the pecuniary gain factor apply

where the gain was expected "as a result of the victim's death." Rec. vol. 47, at 3527-28. In instances of felony murder, if the jury were allowed to consider whether the underlying felony alone was committed in expectation of pecuniary gain, the pecuniary gain aggravator would be automatic where the underlying felony is robbery. This is because pecuniary gain is implicit in the offense of robbery.

Congress clearly expressed, through § 3592(c)(1), a list of twenty felony offenses which automatically aggravate the death penalty whenever a death occurs during their commission. Robbery is not listed among these felonies. That exclusion suggests that the pecuniary gain aggravator applies when the murder itself was committed as consideration for, or in expectation of, anything of pecuniary value. See United States v. Glover, 43 F. Supp. 2d 1217, 1222 (D. Kan. 1999) (noting government attorney's argument that the "offense" to which § 3592(c)(8) refers is the "capital homicide" rather than the robbery); United States v. Cuff, 38 F. Supp. 2d 282, 288 (S.D.N.Y. 1999) ("[Section 3592(c)(8)] appear[s] to be directed at a murder . . . in which pecuniary gain can be expected to follow as a direct result of the crime. A murder from which pecuniary gain does not directly result would not appear to be within the reach of the statute.") (emphasis added); cf. Woratzeck v. Stewart, 97 F.3d 329, 334-35 (9th Cir. 1996) (construing Arizona pecuniary gain aggravator as requiring proof "that the killing

-51-

was done with the expectation of pecuniary gain" and noting further that "[e]ven if it is true that under many circumstances a person who kills in the course of a robbery is motivated to do so for pecuniary reasons, that is not necessarily so" and that "[a] defendant is free to argue that the killing was motivated by reasons unrelated to pecuniary gain"); Webster, 162 F.3d at 325 (5th Cir. 1998) ("[Section 3592(c)(9)] requires a finding that 'the defendant committed the offense after substantial planning and premeditation to cause the death of a person,'. . . obviously directing the premeditation to causing death and not to mere commission of the offense when the two diverge.").

The pecuniary gain instruction challenged here required the jury to determine whether "the offense" was committed in expectation of pecuniary gain. The instruction failed to specify the "offense" to which it referred was the homicide, not the underlying robbery, and thereby failed to impose a necessary limitation. Therefore, the instruction was erroneous. Cf., Glover, 43 F. Supp. 2d at 1222 (ordering government to "specifically indicate the nature of [the] aggravator," even after government attorney clarified that the "offense" to which § 3592(c)(8) referred was the "capital homicide" not the robbery).

Ordinarily, we would proceed to determine whether this error was harmless. See Jones, 527 U.S. at 402 (citing Clemons v. Mississippi, 434 U.S. 738, 753-54 (1990)). However, in this case, in determining whether there is overwhelming

support in the record for Mr. Chanthadara's death sentence, so as to deem any error harmless, we must also consider certain prejudicial information that some of the jurors encountered. See infra. Accordingly, we will conduct our harmless error determination only after we consider the effect of that prejudicial information.

### 2. Juror Exposure to Publicity During Penalty Phase

Prior to initiating the penalty phase, the judge sent the jurors home for a few days. In the intervening time, The Wichita Eagle published a second article, reiterating that the judge believed the defense's evidence to be "a smoke screen." Add'm to Aplt's Br., doc. K.

At the opening of the penalty phase, defense counsel requested the district court to make specific inquiry about whether jurors had been exposed to the second article. The judge asked the jury whether "anything happened since the time you left here following your verdict last week and this morning which any of you believe the lawyers and I ought to know about which would bear on your ability to further judge this case fairly and impartially." Rec. vol. 45, at 2922. No juror responded, and the court inquired no further. The jury proceeded to hear the penalty evidence and sentenced Mr. Chanthadara to death.

Mr. Chanthadara argues the failure of the court to make specific inquiry

about exposure to this additional publicity violated his Fifth Amendment due process rights, his Sixth Amendment rights to counsel and a fair jury trial, and his rights under the Eighth Amendment. We review a district court's treatment of allegations of jury bias for abuse of discretion. See Thompson, 908 F.2d at 650. In determining whether the court's failure to specifically voir dire the jury regarding exposure to prejudicial publicity denied a defendant the right to a fair trial, we generally consider whether (1) the nature of the news material is innately prejudicial and (2) the material is likely to have reached the jury. See id. at 652; see also Barry v. Bergen County Probation Dept., 128 F.3d 152, 163 (3d Cir. 1997); Williams, 809 F.2d at 1092.

However, in light of the previous article published during the guilt phase, application of this test is unnecessary. Although the overwhelming evidence that Mr. Chanthadara aided and abetted in the charged offenses establishes that reversal of the convictions is not warranted, the sentencing proceedings involved additional evidence and additional elements that the prosecution was required to prove. See Brooks v. Kemp, 762 F.2d 1383, 1402 n.27 (11th Cir.) (noting "that overwhelming evidence of guilt should not contribute to a reviewing court's conclusion that [an error] did not affect the jury's decision in the penalty phase") vacated on other grounds by Kemp v. Brooks, 106 S. Ct. 3325 (1986). The same six jurors who were exposed to the judge's "smoke screen" comment during the

guilt phase continued to serve during the sentencing proceedings, and they eventually decided to impose the death penalty. Accordingly, we must determine whether their exposure to the judge's comment was harmless as to Mr. Chanthadara's sentence. Because we conclude the jurors' exposure to the judge's smoke screen comment during the guilt phase was not harmless as to Mr. Chanthadara's sentence, we do not address the prejudicial effect of the second article. [5]

We reiterate that, "once a presumption of prejudice arises, the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." Davis, 60 F.3d at 1485 (internal quotation marks omitted). An impartial jury is central to the right to a fair trial, see McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984) and the lack thereof – which we find with

_____

[5]We point out that the second article may have caused additional prejudice because it presented an opportunity for jurors other than the initial six to be exposed to the judge's smoke screen comment. Also, the second article was republished a little over a week prior to sentencing, thereby bringing the smoke screen comment fresh into the minds of the jurors as they entered the penalty phase of Mr. Chanthadara's trial. Moreover, if any of the jurors were exposed to both articles, the judge's smoke screen comment would be further emphasized in their minds and thus more likely to influence their decision-making. Nevertheless, the fact that the judge's smoke screen comment was republished in a second article just prior to commencement of the penalty phase only enhances, but is not necessary to, our conclusion that the jurors' exposure to the judge's smoke screen comment during the guilt phase prejudiced Mr. Chanthadara at sentencing.

the instant error – is a constitutional violation.

Accordingly, we ask ourselves whether we can "declare a belief that [the error] was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967). The Supreme Court has confirmed since Chapman that "[t]he question . . . is not whether the legally admitted evidence was sufficient to support the death sentence." Satterwhite v. Texas, 486 U.S. 249, 258 (1988). Nor is "[t]he operative question . . . whether we are convinced of defendant['s] guilt," rather, it is "'whether there is a reasonable probability that the [error] complained of might have contributed to the [jury's decision].'" United States v. Torrez-Ortega, 184 F.3d 1128, 1135 (10th Cir. 1999) (quoting Chapman, 386 U.S. at 23); see, e.g., United States v. Begay, 937 F.2d 515, 525 (10th Cir. 1991) (concluding the effect of a Confrontation Clause error was not harmless under Chapman, even where "[t]he overall strength of the prosecution's case was substantial"). Moreover, to determine harmlessness we "should assess the possibility of prejudice by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware." United States v. Hornung, 848 F.2d 1040, 1045 (10th Cir. 1988) (citations and internal quotation marks omitted). Because "[a] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming support," we will consider the

-56-

strength of the evidence supporting the jury's sentence of death. Strickland v. Washington , 466 U.S. 668, 696 (1984).

In order to sentence Mr. Chanthadara to death, the jury needed to find at least one of the two statutory aggravating factors presented in the instructions – the pecuniary gain factor or the heinous, cruel, and depraved conduct factor. Because the court's instruction on the pecuniary gain factor was erroneous, we will not consider this factor in assessing the weight of the evidence supporting the jury's decision to impose the death penalty. See Jones v. United States , 527 U.S. 373, 402 (1999) (stating that harmless-error review of a death sentence may be performed by considering "whether absent an invalid factor, the jury would have reached the same verdict" or by considering "whether the result would have been the same had the invalid aggravating factor been precisely defined').

As to the other aggravating factor, the court instructed the jury that "[t]o establish that [Mr. Chanthadara] killed [Mrs.] Sun in an especially heinous, cruel, or depraved manner, the United States must prove that [Mr. Chanthadara's] actions involved either torture or serious physical abuse to [Mrs.] Sun." Add'm to Aplt. Br., doc. N, Jury Instr. 12. The government presented no new evidence in support of this factor, choosing instead to rely on the trial record. At trial, however, there was scant direct evidence Mr. Chanthadara shot and killed Mrs. Sun. Moreover, there was no direct evidence that he participated in the abuse

preceding her murder.  Cf., Mayes v. Gibson, No. 99-6047, 2000 WL 543400, at *5 (10th Cir. May 4, 2000) (remanding for evidentiary hearing on habeas petitioner's ineffective assistance of counsel claim because the evidence that the defendant committed the crime was "entirely circumstantial" and therefore could not "fairly be described as overwhelming" so as to create a reasonable probability that, absent the error, the jurors may not have imposed the death sentence). Additionally, the murder weapon was never found, and no eyewitness to Mrs. Sun's murder testified.  Finally, there was no physical evidence establishing Mr. Chanthadara was upstairs when the murder occurred.

One witness, Mr. Namphengsone, testified that Mr. Chanthadara was one of three robbers who took Mrs. Sun upstairs and that he carried the murder weapon into the restaurant.  Mr. Namphengsone recalled Mr. Nguyen stating, after the three returned from upstairs, "He shot her."  Rec. vol. 40, at 2113.  Mr. Namphengsone also testified that, sometime after the robbery, he questioned Mr. Chanthadara about what happened upstairs in the room where Mrs. Sun was killed.  According to Mr. Namphengsone, Mr. Chanthadara admitted to shooting Mrs. Sun because she would not open the safe.  See id. at 2134.  Yet Mr. Namphengsone's testimony is inconsistent with the information he provided the FBI prior to accepting a plea bargain from the government.  When the FBI inquired of Mr. Namphengsone whether he had ever "ask[ed] [Mr. Chanthadara]

-58-

if he did it," Mr. Namphengsone told the FBI that Mr. Chanthadara never answered any of his questions. Id. at 2203. Further, during his initial FBI interview, he told agents he had not heard anything about anyone being hurt during the robbery. See id. at 2160.

Another witness, Mr. Soukamneuth, placed the murder weapon in Mr. Chanthadara's possession when the four returned to the getaway car. Mr. Soukamneuth also testified that, as they drove off from the restaurant, everyone was angry and yelling at Mr. Chanthadara. He further recounted that Mr. Chanthadara put a gun to his head and asked if anyone wanted him to shoot himself.

Both Mr. Soukamneuth and Mr. Namphengsone testified that Mr. Chanthadara threw the 9mm pistol out the window over a bridge on the drive back from the crime scene. However, Mr. Namphengsone's story changed after he pleaded guilty – initially he told the FBI that the 9mm pistol was last seen in his own apartment, not thrown from the car.

All of this evidence emanates from the testimony of two accomplices, neither of whom witnessed the murder, but both of whom entered into plea agreements with the government, had multiple prior convictions, and admitted to being addicted to crack cocaine and to prior involvement in numerous other robberies. See United States v. Gomez, 191 F.2d 1214, 1223-24 (10th Cir. 1999)

(Confrontation Clause violation not harmless where the only independent corroborating evidence establishing the defendant's guilt was "the testimony of . . . a witness testifying pursuant to a plea agreement"); see also Brooks, 762 F.2d at 1402 n.27 (noting that reviewing courts should consider weaknesses in the government's evidence of guilt when determining whether an error may have contributed to the jury's imposition of a death sentence). Mr. Soukamneuth admitted during cross examination that it would be fair to characterize him as a "dishonest person." Rec. vol. 40, at 2019. Additionally, as previously mentioned, Mr. Namphengsone's story contained multiple inconsistencies. See United States v. Murray, 103 F.3d 310, 320 (3d Cir. 1997) (determining the evidence against the defendant was not so overwhelming as to deem erroneous admission of evidence harmless where the only eyewitness delayed reporting what he knew and had an extensive history of drug use, and "[m]any of the government's other witnesses were similarly impeached on the basis of inconsistencies in their stories, their interest in cooperating with the prosecution, and their own drug use"); Dudley v. Duckworth, 854 F.2d 967, 972 (7th Cir. 1988) (reversing sentence because evidence was "impressive but not overwhelming" where only two witnesses, with sometimes conflicting testimony, implicated the defendant in the robbery and both witnesses were admitted accomplices who plea bargained with the government).

The accomplice testimony aside, the government's sole remaining evidence

establishing Mr. Chanthadara killed Mrs. Sun in an especially heinous, cruel, or depraved manner is his alleged confession to Julia Newton. Ms. Newton testified that, subsequent to telephone conversations with Mr. Namphengsone in which he discussed the robbery with her, Mr. Chanthadara called her from jail and admitted that he "pulled the trigger." Rec. vol. 41, at 2274. However, Ms. Newton has had an intimate relationship with an accomplice – Mr. Namphengsone – and admitted that she "barely knew" Mr. Chanthadara prior to the robbery.        Id. at 2278.

It was for the jury to weigh the credibility of Ms. Newton's testimony. That said, we cannot fairly characterize this evidence, even coupled with the accomplice testimony, as so overwhelming as to render the prejudicial effect of the judge's smoke screen comment harmless beyond a reasonable doubt.        See Murray, 103 F.3d at 320;   Dudley, 854 F.2d at 972;   see also United States v. Cunningham, 145 F.3d 1385, 1396-97 (D.C. Cir. 1998) (concluding that constitutional error was not harmless under      Chapman even where the government presented the following evidence implicating the defendant in a murder occurring during a robbery: a motive to kill the victim; a statement made by the defendant with a gun in his hand on the day of the robbery that he "had to take care of something;" a confession to a cellmate; and the defendant's possession of the firearm used during the robbery at the time of his arrest),      cert. denied, 525 U.S. 1128 (1999).

The Supreme Court has made it clear that, because the consequences of a death verdict are so final and severe, "this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." Lockett v. Ohio, 438 U.S. 586, 604 (1978). Consequently, we are required to take "extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence is not imposed out of . . . prejudice." Eddings v. Oklahoma, 455 U.S. 104, 117-18 (1976) (O'Connor, J., concurring). Thus, incorporating our earlier analysis of the prejudicial nature of the judge's comment, we conclude that, due to the lack of overwhelming evidence supporting the statutory aggravating factor, there is a "reasonable probability" the judge's smoke screen comment "'might have contributed to the [the death sentence].'" Torrez-Ortega, 184 F.3d at 1135 (quoting Chapman, 386 U.S. at 23). [6]

---

[6]We note that The Wichita Eagle published a third article, just prior to the penalty phase of Mr. Chanthadara's trial, which headlined, "DEATH SENTENCE WOULD BE LANDMARK," with a sub-headline stating, "If a jury sentences him to death, man convicted in Mandarin killing could face years of appeals." Add'm to Aplt's Br., doc. K. Mr. Chanthadara argues the court's failure to specifically inquire of the jurors whether any of them saw the article was reversible error. Specifically, he contends this article prejudiced him during the penalty phase because the jurors could have concluded from the article that their sentencing decision was not final and that an appellate court would bear final responsibility for any death sentence imposed in the case.

We recognize the Supreme Court's holding that reducing a juror's sense of responsibility for a death sentence violates the Eighth Amendment. See Caldwell v. Mississippi, 472 U.S. 320, 330-33 (1985). However, there is no need for us to

**3.      Exclusion of Jurors for Cause Based on Death Penalty Views**

Mr. Chanthadara challenges the district court's removal for cause of nine veniremen based on their views on the death penalty.  Because the erroneous exclusion of even one potential juror mandates reversal of a death sentence, our analysis takes us no further than potential juror Joy Phillips.         See Gray v. Mississippi , 481 U.S. 648, 657-68 (1987) (erroneous exclusion of one potential juror based on her views on the death penalty was reversible constitutional error); see also  O'Bryan v. Estelle  , 714 F.2d 365, 371 (5th Cir. 1983) ("The courts have required a death sentence to be set aside even if only one potential juror has been excluded for opposing the death penalty on grounds broader than those set forth in Witherspoon .") (citing  Davis v. Georgia  , 97 S. Ct. 399 (1976).

> a.      Removal based solely on responses to a questionnaire      .

Prior to trial, a pool of 170 potential jurors watched a video on federal jury service and completed a questionnaire.  Pretrial challenges were allowed based on the questionnaire answers.  Mrs. Phillips was one of eight jurors removed for cause solely on the basis of her answers to the pre-voir dire questionnaire.  Mr.

---

decide if the statements made in this article rise to the level of an Eighth Amendment violation.  Our reversal of Mr. Chanthadara's sentence rests solely on the jurors' exposure to the judge's smoke screen comment and the lack of overwhelming evidence supporting the death sentence to make such exposure harmless beyond a reasonable doubt.

Chanthadara argues removal of prospective jurors based on questionnaire answers alone, without any voir dire, is per se constitutional error.

In reply, the government asserts, even though the district court did not conduct face-to-face credibility assessments, the questionnaire clearly established Mrs. Phillips had views about the death penalty that would prevent or substantially impair her ability to apply the law in this case. The government suggests the trial court is under no constitutional obligation to rehabilitate prospective jurors who have indicated unalterable opposition to the death penalty.

This court has expressly sanctioned pre-voir dire excusal of jurors in non-capital cases based on jury questionnaires. See United States v. Contreras, 108 F.3d 1255, 1269-70 (10th Cir. 1997). Other circuits have permitted the same. See United States v. Paradies, 98 F.3d 1266, 1277-81 (11th Cir. 1996); United States v. North, 910 F.2d 843, 909-10 (D.C. Cir.), withdrawn and superseded in part on other grounds, 920 F.2d 940 (1990). Although potential jurors may be removed before voir dire for hardship or bias, this practice is expressly permitted by the Jury Select and Service Act, 28 U.S.C. § 1866(c). See Webster, 162 F.3d at 347-48 (removal for lying on questionnaire); Paradies, 98 F.3d at 1280 (removal for hardship).

No case has considered whether questionnaire responses may be sufficient to excuse jurors in capital cases, without voir dire, on the basis of their death

-64-

penalty views. Nonetheless, the Supreme Court has expressly warned against oversimplifying the inquiry as to whether jurors can perform their duty notwithstanding their views on the death penalty. "[D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." Wainwright v. Witt, 469 U.S. 412, 424 (1985). Thus, there is some support for Mr. Chanthadara's assertion that voir dire is required prior to excusing a juror for cause based on his views on capital punishment. See, e.g., id. at 429 ("The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record.") (emphasis added); Moore v. Gibson, 195 F.3d 1152, 1168 (10th Cir. 1999) ("In making such a determination, the trial judge must assess the credibility of the prospective juror, a task an appellate court cannot easily do based upon a record.") (emphasis added), petition for cert. filed, (March 24, 2000) (No. 99-8812); Darden v. Wainwright, 767 F.2d 752, 761 (11th Cir. 1985) (Clark, J.,dissenting) ( "A conscientious trial judge must be bent upon determining if a prospective juror has such a mind set that he or she would refuse to vote for the death penalty regardless of the evidence in the case. That is fact-finding."). Moreover, because the jurors are vested with greater discretion in capital cases, the examination of prospective jurors must be more careful than in

non-capital cases.   See, e.g. , Turner v. Murray , 476 U.S. 28, 35-36 (1986).

Nevertheless, we reserve for another day the question of whether a trial court has an obligation to voir dire prospective jurors before removing them for cause based on their views on the death penalty.  We choose to do so because, even if we assume the district court was not required to conduct voir dire before removing her, Mrs. Phillips's answers on the questionnaire do not support removing her for cause under the standard announced in      Witherspoon v. Illinois  , 391 U.S. 510, 518-23 (1968), and later clarified in      Witt , 469 U.S. at 416-35.

b.      Standard of review where the district court did not conduct voir dire .

Although we have passed on deciding whether voir dire is required before excluding a juror for cause based on death penalty views, we are left to ponder what standard of review to apply to a district court's decision to exclude a prospective capital juror based solely on questionnaire answers.  Ordinarily, we review the district court's decisions concerning the seating or excusing of jurors for abuse of discretion.   See United States v. Bedonie  , 913 F.2d 782, 795 (10th Cir.1990).  However, the heightened deference we pay to these determinations is based almost exclusively on the trial judge's unique ability to observe demeanor and assess credibility.   See Witt , 469 U.S. at 426, 428 (noting that the trial court's determination of juror bias "is based upon determinations of demeanor and

-66-

credibility that are peculiarly within a trial judge's province," and, as such, "this is why deference must be paid to the trial judge who sees and hears the jurors"); see also United States v. Cerrato-Reyes, 176 F.3d 1253, 1260 (10th Cir. 1999) (citing Witt and reviewing district court's findings for clear error); Castro v. Ward, 138 F.3d 810, 824 (10th Cir.) ("Because issues of credibility and demeanor are crucial to the trial judge's determination our review of that determination is quite deferential."), cert. denied sub nom. Castro v. Gibson, 525 U.S. 971 (1998); United States v. Flores, 63 F.3d 1342, 1355 (5th Cir. 1995) ("We give considerable deference to the court's decision to excuse a juror [based on her death penalty views], because such decisions are based in large part on its face-to-face credibility assessment of the prospective jurors."); Deputy v. Taylor, 19 F.3d 1485, 1499 (3d Cir. 1994) ("The trial court is in the best position to observe the demeanor of the prospective jurors."); cf. Spivey v. Head, 207 F.3d 1263, 1275 (11th Cir. 2000) ("The assessments of jurors' states of mind are based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province and are therefore entitled to deference on habeas review.") (internal quotation marks omitted); Mann v. Scott, 41 F. 3d 968, 982 (5th Cir. 1994) ("[S]uch credibility determinations are more appropriately resolved under the watchful eye of the trial judge than by an appellate court staring at a cold record, which is precisely why they are accorded a presumption of correctness

under § 2254(d).");  Maynard v. Dixon , 943 F.2d 407, 415 (4th Cir. 1991) ("The Court has held that the question of juror bias is to be resolved by the trial judge's assessment of demeanor and credibility.").

Thus, the discretion generally accorded the district court is based on its ability to assess the credibility of prospective jurors upon observing their demeanor in responding to questions.  Accordingly, because the trial court here was not in a position to observe Mrs. Phillips's demeanor, it was in no better position than an appellate court to assess her answers pursuant to the law governing the removal of prospective jurors based on their death penalty views. Thus, the court's decision to remove the juror for cause based on her death penalty views is entitled to no particular deference.  Consequently, we review de novo the court's determination that Mrs. Phillips's questionnaire responses alone warranted excusing her for cause under the      Witherspoon  -Witt  standard.


c.      The Witherspoon-Witt standard    .

Next, we turn to the appropriate standard for removing a prospective juror for cause based on her views on capital punishment.  The Sixth Amendment guarantees an impartial jury.  A jury composed "by excluding veniremen for cause simply because they expressed general objections to the death penalty or voiced conscientious or religious scruples against its infliction" violates the Sixth

Amendment guarantee of an impartial jury. See Witherspoon , 391 U.S. at 522. A juror may be properly excluded for cause based on his death penalty views only if those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Witt, 469 U.S. at 424 (internal quotation marks omitted). The burden of proving bias rests on the party seeking to excuse the venire member for cause. See id. at 423.

"If a prospective juror's emotional opposition is so severe that it compels her to ignore the law or disables her from answering the statutory questions without conscious distortion or bias, exclusion for cause is proper." Mann , 41 F.3d at 981 (citing Adams v. Texas , 448 U.S. 38, 50 (1980)). "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." Dutton v. Brown , 788 F.2d 669, 675 (10th Cir. 1986).

        d.      Ms. Phillips's questionnaire responses did not support excusal for cause .

The sixty-question questionnaire contained only four questions pertaining to the death penalty. Question 56 asks, "What are your personal views about the death penalty?" Question 57 asks, "Do you have religious, moral or personal beliefs which influence your opinion regarding the death penalty?" and allows room for an explanation. Question 58 asks, "Would these feelings regarding the

death penalty affect your ability to decide in the first part of the trial whether the defendant is guilty or not guilty of the crimes charged?" and allows room for an explanation. Question 59 asks the respondent to choose one or more of six statements that most accurately reflect his or her view of the death penalty. These are:

a.   In a case in which the defendant is convicted and in which the death penalty is requested, I would always vote to impose the death penalty, regardless of the circumstances of the case and the law which the court instructs must be applied by the jury.

b.   I am strongly in favor of the death penalty, and would have a difficult time voting not to impose it, regardless of the circumstances of the case and the law which the court instructs must be applied by the jury.

c.   I am generally in favor of the death penalty, but I would base a decision whether to impose it on the circumstances of the case and the law which the court instructs must be applied by the jury.

d.   I am personally, morally, or religiously opposed to the death penalty, but I would base a decision whether to impose it on the circumstances of the case and the law which the court instructs must be applied by the jury.

e.   I am strongly opposed to the death penalty, and would have a difficult time voting to impose it, regardless of the circumstances of the case and the law which the court instructs must be applied by the jury.

f.   I am personally, morally, or religiously opposed to the death penalty, and would never vote to impose it regardless of the circumstances of the case and the law which the court instructs must be applied by the jury.

Rec. vols. 29 & 30, Potential Juror Responses to Questionnaire. [7]

Potential juror Ms. Phillips indicated in Question 56: "I believe the death penalty is proper in some cases although I don't think I would be able to vote for the death penalty in a case." Rec. vol. 30, Questionnaire of Juror Phillips, at 14. In Question 57 she clarified that this was because she didn't feel she would "ever be 100% sure that [death] was the proper verdict." Id. In Question 58, she indicated her feelings regarding the death penalty would not affect her ability to decide in the first part of the trial whether the defendant is guilty or not guilty. Mrs. Phillips failed to select any of the available responses in Question 59. See id. at 15. To Question 60, which simply asked if there is other information the judge or lawyers might find useful, she responded, "I feel the death penalty is proper in some cases but I don't feel I could ever think there was enough evidence to come to that conclusion even though I might feel the person has been proven guilty." Id.

After careful review, we conclude Mrs. Phillips's responses do not sufficiently indicate that her views on capital punishment would "substantially impair . . . performance of [her] duties as a juror in accordance with [the court's]

_____

[7] Although we do not wish to foreclose the possibility that some responses to written questions would sufficiently support excusing a prospective juror for cause, the ambiguity of the written questions at issue here exemplifies the danger of relying solely on questionnaire answers in this delicate inquiry.

-71-

instructions and [her] oath." Witt, 465 U.S. at 424. Rather, her statements appear ambiguous and do not justify dismissal for cause.

Significantly, Mrs. Phillips refused to answer Question 59, which could reasonably be interpreted as expressing that none of the available responses, particularly "e" and "f," accurately reflected her position on the death penalty. She stated she did not know whether she could ever think there was enough evidence to sentence a defendant to death. However, she was never informed that the law would dictate what degree of proof was necessary to impose a death sentence. More importantly, she was never asked, or required to answer, whether, if the facts of the case and the evidence presented warranted imposition of the death penalty under the law, she would at least consider imposing a death sentence in light of her personal convictions. Thus, none of the questions which Mrs. Phillips answered articulated the proper legal standard under Witt. See, e.g., Darden v. Wainwright, 767 F.2d 752, 754 (11th Cir. 1985) (upholding exclusion of prospective juror where "the trial judge did articulate an unquestionably correct legal standard [under Witt] on many . . . occasions during the voir dire"), aff'd, 477 U.S. 168 (1986). Nothing in Mrs. Phillips's responses on the record indicate an intention to disregard or circumvent the law or the court's instructions. Additionally, she stated twice on the questionnaire that she believed "the death penalty is proper in some cases." Rec. vol. 30, Questionnaire of Juror Phillips, at

14-15; see Hance v. Zant, 696 F.2d 940, 955 (11th Cir. 1983) (concluding that a potential juror's statements that she "fe[lt] there are times when the death penalty is warranted" but "[did] not believe that [she] with [her] conscience could vote to impose the death penalty" demonstrated "uncertainty about [her] convictions and ambiguity about [her] feelings" and, therefore, "did not indicate that [her] views about capital punishment would substantially impair the performance of [her] duties as [a] juror[] under oath"), overruled on other grounds by Brooks v. Kemp, 762 F.2d 1383 (11th Cir. 1985).

The government argues excusing Mrs. Phillips for cause based on her statements was proper under Castro v. Ward, 138 F.3d 810 (10th Cir. 1998). There, the prospective juror was excluded after indicating that "she [did] not know, no matter what [the] evidence [was], whether she [could] give the death penalty." Id. at 824-25 (emphasis added). Castro is distinguishable on multiple grounds. First, the juror's statement in Castro could reasonably be interpreted as stating that her views were such that she might have disregarded the evidence. As discussed earlier, Mrs. Phillips statements are not so strong as to imply she would have disregarded the evidence. Second, unlike the excused juror in Castro, Mrs. Phillips indicated she felt the death penalty was proper under some circumstances. Finally, the trial judge in Castro asked the juror numerous questions during voir dire and, having the benefit of observing her demeanor, was entitled to resolve

-73-

any ambiguity in favor of the State. [8] See Moore, 195 F.3d at 1170; see also

United States v. Barnette, Nos. 98-5, 98-11, 2000 WL 524799, at *4 (4th Cir. May

2, 2000) ("[W]e defer[] to the discretion of the trial judge when certain jurors'

answers in the voir dire inquiry [are] ambiguous and arguably contradictory

because this inquiry turns in large part on assessments of demeanor and

credibility we cannot duplicate.") (emphasis added); Truesdale v. Moore, 142

F.3d 749, 757 (4th Cir.) ("We generally review the determinations of the trial

judge, who had the benefit of first-hand exposure to the voir dire, with deference.

This deference means that where a venireman's responses reveal some ambiguity

about his willingness or ability to impose the death penalty, we presume the

correctness of the trial court's decision.") (emphasis added), cert. denied, 525

U.S. 931 (1998); . Here, on the other hand, the court was not "aided by its

assessment of the juror's credibility," Moore, 195 F.3d at 1170, and, as such, we

hold it was not entitled to resolve any ambiguity in the government's favor.

Perhaps further inquiry by the court would have established Mrs. Phillips

was not fit to sit on a death penalty jury. However, the court failed to "clarify[]

[prior to excusing her for cause] that [she] opposed the death penalty to a degree

which would have made it impossible for [her] to follow the law." Mayes, 2000

WL 543400, at *7. Thus, the court erred in excluding Mrs. Phillips for cause.

---

[8]No portion of the voir dire transcript is included in the Castro opinion.

"Where the court finds that even one juror was improperly excluded, the defendant is entitled to a new sentencing, because the right to an impartial adjudication is 'so basic to a fair trial that [its] infraction can never be treated as harmless error.'"  Fuller v. Johnson , 114 F.3d 491, 500 (5th Cir. 1997)  (quoting Gray v. Mississippi , 481 U.S. 648, 668 (1987)).

**4.      Victim Impact Evidence**

Mr. Chanthadara's challenge relating to the victim impact evidence is twofold.  First, he asserts the district court erred in instructing the jury that it could consider victim impact as a non-statutory aggravating factor capable of offsetting the weight of any mitigating factors.  Second, he argues the sheer volume and prejudicial nature of victim impact evidence permitted at the sentencing phase violated his Fifth Amendment due process right.

Title 18 U.S.C. § 3593(a)(2) permits the introduction of victim impact evidence in federal criminal prosecutions.  The Supreme Court has upheld the constitutionality of victim impact evidence in capital sentencings.      See Payne v. Tennessee , 501 U.S. 808, 819-27 (1991).

As to Mr. Chanthadara's first argument, he specifically contends that, because all murders have victims, and all victims have families, a victim impact

aggravating factor does not narrow the class of offenses for which the death penalty may be imposed, as required under the Eighth Amendment. This argument is foreclosed by binding case law. The Supreme Court has recently stated: "The Eighth Amendment . . . permits capital sentencing juries to consider evidence relating to the victim's personal characteristics and the emotional impact of the murder on the victim's family in deciding whether an eligible defendant should receive a death sentence." Jones, 527 U.S. at 395. In concluding the victim impact aggravating factor at issue was not unconstitutionally overbroad, the Court explained:

> Of course, every murder will have an impact on the victim's family and friends . . . . Even though the concept[] of victim impact . . . may well be relevant in every case, evidence of . . . victim impact in a particular case is inherently individualized. . . . So long as . . . victim impact factors are used to direct the jury to the individual circumstances of the case, we do not think [the] principle [against bias or caprice in the sentencing decision] will be disturbed.

Id. at 401.

Here, the victim impact aggravating factor asked whether "[Mr.] Chanthadara caused permanent harm to the family of [Mrs.] Sun by her murder which was committed in close proximity to her husband and two daughters." Add'm to Aplt's Br., doc. O, at 5. This victim impact factor sufficiently "direct[ed] the jury to the individual circumstances of the case." Jones, 527 U.S. at 401.

-76-

Additionally, our own circuit has pronounced:

> We are not convinced that sympathy for victims and/or their families cannot be appropriately considered at the penalty phase to counteract defendant's mitigating evidence, provided it is based on evidence adduced at trial and the evidence produced is not so unduly prejudicial as to render the defendant's trial fundamentally unfair.

Smallwood v. Gibson, 191 F.3d 1257, 1273 (10th Cir. 1999), petition for cert. filed (March 3, 2000) (No. 99-9445).  Accordingly, we reject this challenge to the admission of victim impact evidence.  Victim impact evidence may be considered as an aggravating factor.

Mr. Chanthadara's second argument challenges the volume and nature of the victim impact evidence admitted during the penalty phase.  He contends the evidence used to establish victim impact so infected the trial that it denied him due process.

In Payne, Justice O'Connor explained:

The possibility that [victim impact] evidence may in some cases be unduly inflammatory does not justify a prophylactic, constitutionally based rule that this evidence may never be admitted.  Trial courts routinely exclude evidence that is unduly inflammatory;  where inflammatory evidence is improperly admitted, appellate courts carefully review the record to determine whether the error was prejudicial.

> We do not hold today that victim impact evidence must be admitted, or even that it should be admitted.  We hold merely that if a State decides to permit consideration of this evidence, the Eighth Amendment erects no per se bar.  If, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate

-77-

relief under the Due Process Clause of the Fourteenth Amendment. 501 U.S. at 831 (citation omitted) (O'Connor, J., concurring). "To violate due process, an error must be of sufficient significance that it denies the defendant the right to a fair trial." Barnette, 2000 WL 524799, at * 11 (citing Greer v. Miller, 483 U.S. 756, 765 (1987)).

Here, the jury heard testimony from Mrs. Sun's husband and two children, ages seven and ten. Mr. Sun's testimony was amplified with numerous colored photographs of Mrs. Sun while she was alive. Both children ended their testimony in tears. The jury was also allowed to take into the jury room physical evidence of the impact of Ms. Sun's death on her children. Among these items were letters the children had written to their dead mother and a daily journal which described one child's loss.

We are unaware of any case before the Supreme Court or our circuit that has vacated a sentence because the victim impact evidence presented was so unduly inflammatory as to render the proceeding fundamentally unfair. See Barnette, 2000 WL 524799, at * 11 ("No case has come to our attention in which this court or the Supreme Court has vacated a sentence because victim impact evidence violated the limits of due process."). Moreover, courts have upheld the admission of victim impact evidence similar to that introduced here. See, e.g., Hall, 152 F.3d at 405 (upholding written statements from family members briefly

describing the victim's character and her aspirations of becoming a doctor as well as the pain they felt as a result of her senseless death, including a statement from the victim's father that he no longer had reason to live and had become a strong drinker as a result of his father's death); Black v. Collins, 962 F.2d 394, 408 (5th Cir. 1992) (concluding victim impact statements that the victim was a hard-working, devoted wife and mother were not so inflammatory as to deprive the defendant of a fundamentally fair proceeding); Wiley v. Puckett, 969 F.2d 86, 105 (5th Cir. 1992) (allowing statement of the wife of the murder victim describing his store, community work, and kindness); Williams v. Chrans, 945 F.2d 926, 946-47 (7th Cir. 1991) (affirming admission of written victim impact statements because they were brief in light of the overwhelming amount of aggravating evidence admitted, and the court instructed the jury to avoid passion and sympathy in making its decision); see also Felder v. Johnson, 180 F.3d 206, 215 (5th Cir. 1999) ("[T]he potential impact of the [victim] testimony must be considered in perspective with the facts of the crime itself.").

In this instance, we cannot conclude that the victim impact evidence presented was so prejudicial as to render the proceeding fundamentally unfair. See Smallwood, 191 F.3d at 1273; see also Gretzler v. Stewart, 112 F.3d 992, 1009 (9th Cir.1997). Accordingly, we conclude the court did not err in admitting the victim impact evidence.

### III. CONCLUSION

Mr. Chanthadara's convictions are AFFIRMED. We hold that there is no reversible error in the guilt phase of Mr. Chanthadara's trial.

Mr. Chanthadara death sentence is VACATED. In light of the less than overwhelming evidence supporting the aggravating factor necessary to impose the death sentence, the jurors' exposure to the trial judge's comment referring to Mr. Chanthadara's defense as a smoke screen was not harmless. Furthermore, the removal of at least one potential juror excused on the basis of questionnaire answers regarding her death penalty views was reversible error.

Accordingly, the case is REMANDED for RE-SENTENCING in light of this decision.